## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

PAULINO P. ANTONIO,

      Plaintiff,                       Case No. 06-15653

v.                                Hon. Gerald E. Rosen

MICHIGAN DEPARTMENT OF TREASURY,
ROSALIND ROBINSON, and TONY TAYLOR,

      Defendants.

_____/

## OPINION AND ORDER REGARDING
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on_____September 10, 2009_____

PRESENT:  Honorable Gerald E. Rosen
                  Chief Judge, United States District Court

## I.  INTRODUCTION

Plaintiff Paulino P. Antonio commenced this case in this Court on December 19, 2006, alleging that his employer, the Defendant Michigan Department of Treasury, discriminated against him on account of his race and national origin by failing to promote him, and that two Department of Treasury administrators, Defendants Rosalind Robinson and Tony Taylor, were participants in this intentional discrimination.  In light of these allegations, Plaintiff has asserted a Fourteenth Amendment equal protection claim under 42 U.S.C. § 1983 against Defendants Robinson and Taylor, and a claim under Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* against the Defendant

Department of Treasury.[1]

Presently pending before the Court are cross-motions by Plaintiff and Defendants

seeking awards of summary judgment in their favor.  In support of their motion,

Defendants argue, *inter alia,* that Plaintiff has failed to produce evidence that the

Department of Treasury's stated, non-discriminatory reason for denying Plaintiff a

promotion and selecting a different individual for this position was a pretext for unlawful

discrimination on the basis of Plaintiff's race or national origin.  Defendants further

contend that the two individual Defendants, Robinson and Taylor, are shielded against

liability under 42 U.S.C. § 1983 by the defense of qualified immunity.  Plaintiff, for his

part, argues that the record establishes Defendants' intentional discrimination against him

as a matter of law.

These cross-motions have been fully briefed by the parties.  Having reviewed these

briefs and their accompanying exhibits, as well as the record as a whole, the Court finds

that the relevant allegations, facts, and legal arguments are adequately presented in these

written submissions, and that oral argument would not aid the decisional process.

Accordingly, the Court will decide the parties' cross-motions "on the briefs."  *See* Local

Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan.  This opinion and order

sets forth the Court's rulings on these motions.

---

[1]Plaintiff asserted additional claims in his initial complaint, but these claims have since
been dismissed.

## II.  <u>FACTUAL BACKGROUND</u>

Plaintiff Paulino P. Antonio, an Asian-American of Filipino descent, is currently employed by the Defendant Michigan Department of Treasury ("MDT") as an Auditor Manager 12 in the Tax Compliance Bureau, Audit Division.  He has been employed by MDT since 1988 and, as of 2005, had seven years of experience as a senior auditor.

In October of 2005, MDT sought to fill three Auditor Manager 14 positions, two based in Detroit, Michigan and the third based in Elmhurst, Illinois.  As part of its standard process for filling these positions, MDT designated a three-member panel to interview each qualified applicant.  This panel, approved by MDT's Equal Employment Opportunity ("EEO") Office, asks each candidate the same pre-approved questions and analyzes his or her responses under specific criteria, known as competencies, with each member of the panel rating a candidate's responses on a scale of 1 to 5 (with 5 being the highest score) for each of the seven competencies.  The panel then is directed to meet and discuss each candidate's performance, determine each candidate's consensus "score" for each competency, and then reach a consensus as to which candidate should be recommended for hiring or promotion.  The hiring manager then makes the final decision, subject to the approval of the director of MDT's Tax Compliance Bureau, Susan Pifer, as well as MDT's EEO officer and its director of human resources.

With respect to the Auditor Manager 14 positions that MDT sought to fill in the fall of 2005, Susan Pifer (in consultation with the EEO office and human resources) selected a three-member interview panel consisting of (i) Defendant Rosalind Robinson,

3

an African-American Audit Manager 16 and the assistant administrator of the Tax

Compliance Bureau, who chaired the panel; (ii) Don Kulish, a Caucasian Audit Manager

15 who would supervise the candidate selected for the Detroit positions; and (iii) Scott

Gibson, a Caucasian Audit Manager 15 who would supervise the candidate selected for

the Illinois position.  In all, the panel interviewed 13 candidates for the Detroit and

Illinois positions, including Plaintiff, Patricia O'Neal (an African-American), and Ronald

Flowers (also an African-American).[2]

At the conclusion of the interviews, conducted during the first week of November,

2005, the three members of the panel met to discuss the performance of the candidates

and attempt to reach a consensus.  In preparation for this meeting, one of the panelists,

Scott Gibson, prepared a grid in which he tallied up the scores given by each panel

member for each candidate and competency, and then calculated an average score

(ranging up to 15) for each candidate.  (*See* Defendants' Motion, Ex. 7.)[3]  Out of the

candidates for the two Detroit positions, Patricia O'Neal achieved the best average score,

12.08, while the scores of the next two highest-scoring candidates, Plaintiff and Ronald

Flowers, were separated by only 0.04 — Plaintiff's average score was 11.74, while

---

[2]Plaintiff applied only for the Detroit positions, and not the Illinois position.

[3]As noted, each panelist rated each candidate on a scale of 1 to 5 in each of seven competencies.  Thus, the best score that a candidate could achieve in a given competency was 15, if he or she was scored a "5" by each of the three panel members.  In computing a candidate's average score, Gibson added up the candidate's scores (ranging from 3 to 15) in each of the seven competencies and then divided by seven.

4

Flowers' was 11.70.[4]

As noted, the pertinent MDT regulations call for the three-member panel to reach a consensus as to each candidate's score and the candidate to recommend for a position. Unfortunately, the three panelists in this case have offered divergent views as to what transpired in their meeting and whether, in fact, they reached a consensus. Defendant Robinson testified at her deposition that the panel was unable to reach any sort of consensus, and thus did not recommend any candidate for any of the three available positions. (*See* Defendants' Motion, Ex. 3, Robinson Dep. at 16-18, 24.) Don Kulish, on the other hand, testified that the panel first agreed to recommend Patricia O'Neal for one of the Detroit positions, primarily based on her highest average score. (Plaintiff's Response, Ex. 5, Kulish Dep. at 23.) Kulish further testified that the three panel members then reached a consensus on Plaintiff for the remaining Detroit position, based on his second-highest average score, and that Kulish was asked to write a letter on behalf of the panel recommending Plaintiff for this position because "I knew [Plaintiff] best and he was out of my region." (*Id.* at 23-24, 26-27; *see also* Defendant's Motion, Ex. 9 (e-mail and accompanying letter from Kulish setting forth "[t]he panel[']s" recommendation of Plaintiff for one of the Detroit positions).)[5] The third member of the panel, Scott Gibson,

---

[4]Similarly, the two highest-scoring candidates for the Illinois position had average scores that were separated by only 0.07, 10.96 and 10.89.

[5]Kulish also testified that the panel reached a consensus as to which candidate to recommend for the Illinois position, and that Scott Gibson was assigned the task of writing a letter setting forth the panel's recommendation for this position. (*See* Kulish Dep. at 24-25.) According to Robinson, however, Kulish's letter (and perhaps Gibson's as well) was prepared

5

testified that Kulish recommended Plaintiff for one of the Detroit positions and that he concurred in this recommendation, but that Robinson responded that the decision should be left for the director, Susan Pifer, to make because Robinson "was not ready to agree with the recommendation" made by Kulish. (Plaintiff's Motion, Ex. 9, Gibson Dep. at 34, 37.) Gibson further testified that the panel likewise failed to reach a consensus as to Patricia O'Neal, with he and Robinson "recogniz[ing] that [O'Neal] was the top scorer" but Kulish expressing his objection to O'Neal "based upon his previous experience with" her. (*Id.* at 38-39.)[6]

_____

and sent even before the panel had met to discuss the interview process and attempt to reach a consensus on the candidates. (*See* Robinson Dep. at 19-21.)

   [6]The Court is dismayed at the extent to which the parties and their counsel, on both sides, seek to gloss over this obvious divergence in the accounts offered by the three panel members, and instead present a dispute-free (but inaccurate and misleading) view of the record that is more favorable to their respective positions. Defendants acknowledge Kulish's "claim[]" that the panel reached a consensus as to O'Neal and Plaintiff, but then dismiss this testimony on the basis of Robinson's denial that the panel reached any sort of "unanimous decision" on either candidate. (Defendant's Motion, Br. in Support at 3.) Plainly, in resolving Defendants' summary judgment motion, the Court is not at liberty to simply disregard Kulish's testimony on the ground that it conflicts with Robinson's testimony on the same subject.

   Unfortunately, Plaintiff's cross-motion for summary judgment invites the Court to make precisely the opposite credibility assessment on the very same subject. In recounting the panel's meeting following the interviews, Plaintiff states that "it was recognized" that O'Neal "should be recommended for one of the two open Detroit positions," and that "it was agreed" that Plaintiff "would be recommended for the second open Detroit position." (Plaintiff's Motion, Br. in Support at 4-5.) Plaintiff further asserts that "Kulish and Gibson testified they left the meeting with a consensus of who to recommend for the three open positions," but that Robinson "reported otherwise" to management. (*Id.*) Again, to accept this version of the facts, the Court would have to disregard Robinson's testimony that the panel failed to unanimously agree upon the recommendation of a candidate for either of the two Detroit positions. Even worse, Plaintiff's proposed reading of the record is contrary to (and flatly mischaracterizes) the deposition testimony of the third panel member, Gibson, who stated that no consensus was reached as to either Plaintiff or O'Neal because neither Robinson nor Kulish was prepared to

Notwithstanding these questions as to what consensus, if any, was reached among the three panel members as to any of the three open positions, Defendant Robinson reported to director Susan Pifer that the panel had been unable to reach a consensus, at least as to one of the two Detroit positions.[7]  Robinson was accompanied to this meeting by Defendant Tony Taylor, the administrator of MDT's Audit Division.[8]  According to Robinson, she showed Pifer the tally sheet prepared by Scott Gibson and observed that the scores for Plaintiff and Ronald Flowers "were pretty close."  (Robinson Dep. at 23.) She also addressed the recommendation letters written by Kulish (on Plaintiff's behalf) and by Gibson (on behalf of his favored candidate for the Illinois position), stating that she was "not pleased" with these letters because Kulish's letter suggested that the other panel members had concurred in his recommendation, and because other candidates had

---

concur in the other's recommendation.  *(Compare* Plaintiff's Motion, Br. in Support at 1 (stating that both Kulish and Gibson "testified that a consensus had been reached to recommend Plaintiff for one of the two open positions") *with* Gibson Dep. at 51-52 (testifying that "there was not complete consensus" among the three panel members as to the recommendation of Plaintiff for one of the open positions).)  Advocacy and argument premised on reasonable inferences from the evidentiary record is one thing; mischaracterization of the record, however, is not an acceptable or legitimate form of advocacy.

[7]According to Pifer's deposition testimony, Robinson reported that the panel was able to agree upon placing O'Neal in one of the positions, but that no consensus was reached as to the other Detroit position or the Illinois position.  (Plainitiff's Motion, Ex. 3, Pifer Dep. at 18.)

[8]In this position, Taylor ordinarily would have been considered the "hiring manager" who made the final decision on the Auditor Manager 14 position sought by Plaintiff.  However, because Taylor had only recently been promoted to this position, Pifer assumed a greater role in deciding who to hire for the Auditor Manager 14 positions that became available in the fall of 2005.

not been given the opportunity to submit letters on their behalf.  (*Id.* at 23-24.)[9]  Pifer

asked whether it might be possible to differentiate among the candidates based on their

work experience or reference checks, but Robinson responded that "all candidates had

equal work experience and their references were equally favorable."  (Pifer Dep. at 25.)

Following this meeting, Pifer determined that O'Neal should be promoted to fill

one of the Detroit positions, since Robinson had told her that "all three of the panel

members agreed that she should be awarded one of the positions."  (*Id.* at 44.)  As to the

remaining Detroit position and the Illinois position, however, Pifer decided, in

consultation with the EEO office and human resources, that a second round of interviews

should be conducted with the two top-scoring candidates for each position, in light of the

"virtual tie" in the performance of these candidates in the first round of interviews.  (*Id.* at

27, 50-51.)[10]  A new interview panel was formed, consisting of Pifer (a Caucasian),

Taylor (an African-American), and another administrator, Douglas Schafer (a Caucasian),

and this panel recommended Ronald Flowers as its consensus choice for the remaining

Detroit position.  This suit followed, with Plaintiff claiming that the failure to select him

for one of the two Detroit positions was the product of intentional discrimination on

account of his race or national origin.

---

[9]Pifer did not recall any discussion of these letters of recommendation during her meeting with Robinson and Taylor.  (*See* Pifer Dep. at 20.)

[10]Pifer testified that it was Robinson's suggestion to conduct a second round of interviews and that Taylor supported this approach, (*see id.* at 25, 27, 50), but Robinson denied that this was her idea, (*see* Robinson Dep. at 28).

8

# III. <u>ANALYSIS</u>

**A.    The Standards Governing the Parties' Cross-Motions**

Through the present motions, each party seeks summary judgment in its favor on each of Plaintiff's claims.  Under the pertinent Federal Rule, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  As the Supreme Court has explained, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).  In addition, where, as here, a party (Plaintiff) seeks an award of summary judgment in his favor on issues as to which he bears the burden of proof, Plaintiff's "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir. 1986) (internal quotation marks, citation, and emphasis omitted).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party.  *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006).  Yet, the nonmoving party "may not rely merely on allegations or denials in its own pleading," but "must — by affidavits or as otherwise provided in [Rule 56] —

9

set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

Moreover, any supporting or opposing affidavits "must be made on personal knowledge,

set out facts that would be admissible in evidence, and show that the affiant is competent

to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). Finally, "the mere existence of

a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat

summary judgment." *Pack*, 434 F.3d at 814 (alteration, internal quotation marks, and

citation omitted).

**B.  Issues of Fact Remain as to Whether Defendant MDT's Stated Reason for Denying Plaintiff a Promotion Was a Pretext for Unlawful Discrimination.**

In seeking summary judgment in its favor on Plaintiff's Title VII claims of race

and national origin discrimination, Defendant MDT contends that Plaintiff has failed to

establish a *prima facie* case of discrimination, and that Plaintiff also cannot show that

MDT's stated reason for denying him a promotion was a pretext for discrimination. For

his part, Plaintiff argues that the record establishes as a matter of law that MDT's decision

to deny him a promotion was a product of unlawful discrimination on account of his race

or national origin. As explained below, the Court finds neither side's argument on this

issue persuasive, in light of the clear issues of material fact that preclude the resolution of

Plaintiff's Title VII claim as a matter of law.

In the absence of direct evidence of discrimination, Plaintiff must rely on

circumstantial evidence to create an inference of discrimination. This method of proof is

governed by the familiar burden-shifting approach adopted by the Supreme Court in

10

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973).

Under the first prong of this tripartite approach, Plaintiff must establish a *prima facie* case

consisting of four elements:  (i) that he was a member of a protected class; (ii) that he was

qualified for his position; (iii) that he suffered an adverse employment action; and (iv)

that he was replaced by a person outside the protected class or was treated less favorably

than a similarly situated individual outside the protected class.  *See Johnson v. University

of Cincinnati,* 215 F.3d 561, 572-73 (6th Cir. 2000).  Defendants concede that Plaintiff

can satisfy the first three elements of this *prima facie* case, but they challenge his showing

as to the fourth and final element.

　　The Court readily concludes that Plaintiff has established this final element of his

*prima facie* case.  Even accepting, for present purposes, MDT's contention that Plaintiff

and Patricia O'Neal do not qualify as "similarly situated" because of O'Neal's greater

experience and higher average interview score, (*see* Defendants' Motion, Br. in Support

at 10),[11] the simple fact remains that Plaintiff also was treated less favorably than Ronald

Flowers, the individual who was selected for the second and final Detroit Auditor

---

　　[11]Because these were the reasons given for MDT's decision to choose O'Neal over
Plaintiff and the other candidates for the first of the two open Detroit Auditor Manager 14
positions, the Court must be careful not to assign too much weight to these considerations in
determining whether Plaintiff and O'Neal were similarly situated, lest the Court "impermissibly
conflate" the first and later stages of the *McDonnell Douglas* inquiry.  *See White v. Columbus
Metropolitan Housing Authority,* 429 F.3d 232, 242-43 & n.6 (6th Cir. 2005) (explaining that an
appropriate inquiry under the fourth prong of the *prima facie* standard does not entail "the sort of
close comparison that might include consideration of the employer's evaluation of subjective
traits or other details about why the non-protected person was in fact selected over the
plaintiff").

11

Manager 14 position.  MDT cannot seriously deny that Plaintiff and Flowers were similarly situated, given its contention that these two candidates were in a "virtual tie" following the first round of interviews, and given management's acknowledgment that it was not possible to break this tie by resort to any material differences in their experience or references.  Moreover, to the extent that MDT asserts that Plaintiff and Flowers were treated the same because both were required to submit to a second round of interviews, this ignores the evidence that Plaintiff did outperform Flowers in the first series of interviews, albeit by only a small margin.  This claim of equal treatment also overlooks the testimony of one member of the interview panel, Don Kulish, that the panel reached a consensus to recommend Plaintiff for one of the Detroit positions.  Under this record, the second round of interviews could permissibly be viewed as a benefit to Flowers at Plaintiff's expense — *i.e.,* as less favorable treatment of Plaintiff as compared to a similarly situated co-worker outside the protected class.  Accordingly, the Court finds that Plaintiff has established a *prima facie* case of discrimination.

At this point, then, Defendant MDT bears the burden of identifying legitimate, non-discriminatory reasons for its decision to deny Plaintiff a promotion.  *See White,* 429 F.3d at 244.  It is clear that MDT has met this burden of production, and Plaintiff does not contend otherwise.  Specifically, Defendant has produced evidence (i) that O'Neal was selected over Plaintiff for promotion because of her higher average interview score, her greater experience, and the understanding of the principal decisionmaker, Susan Pifer, that all three members of the interview panel had agreed that she should be awarded one

12

of the Detroit positions, and (ii) that Flowers was selected over Plaintiff when he received
higher scores and was the consensus choice of the panel in the second round of interviews
conducted after it was determined that these two candidates had ended up in a "virtual
tie" in the first series of interviews.

Accordingly, the Court turns to the third stage of the inquiry, under which Plaintiff
must present evidence sufficient for a trier of fact to conclude that Defendant MDT's
proffered reasons for failing to promote him were not the true reasons, but were merely a
pretext for unlawful discrimination. *See White,* 429 F.3d at 245. "A plaintiff can refute
the legitimate, nondiscriminatory reason articulated by an employer to justify an adverse
employment action by showing that the proffered reason (1) has no basis in fact, (2) did
not actually motivate the defendant's challenged conduct, or (3) was insufficient to
warrant the challenged conduct." *Johnson v. Kroger Co.,* 319 F.3d 858, 866 (6th Cir.
2003) (internal quotation marks and citation omitted).

Plaintiff has met this burden here, by producing evidence that, if credited by the
trier of fact, would call into question the factual basis for MDT's stated non-
discriminatory reason for denying him a promotion. According to Defendants, the
principal decisionmaker, Susan Pifer, determined that a second round of interviews
should be conducted after she was advised by the chair of the initial interview panel,
Rosalind Robinson, that the panel had been unable to reach a consensus as to a candidate
to recommend for the Detroit Auditor Manager 14 position. Yet, another member of the
initial interview panel, Don Kulish, has testified that the panel ***did*** reach a consensus to

13

recommend Plaintiff for this position.  (*See* Kulish Dep. at 23-24, 26-27.)  If a trier of fact were to credit Kulish's account over Robinson's,[12] then Pifer's decision to conduct a second round of interviews rested upon a false premise — namely, that additional measures were needed to choose between Plaintiff and Ronald Flowers because the initial panel could not agree upon one or the other candidate.  Nor can it be said as a matter of law that Pifer's independent exercise of decisionmaking authority somehow overcame any potential bias that might have arisen from Robinson's inaccurate representation as to the panel's lack of consensus, where Pifer herself has testified that she relied exclusively on Robinson's representation on this point, and that the recommendation for a second round of interviews came from Robinson.  (*See* Pifer Dep. at 18, 26-27.)  This evidence of pretext precludes an award of summary judgment in MDT's favor.

Plaintiff's request for summary judgment in his favor fails for much the same reason.  To secure such an award, Plaintiff must point to an evidentiary record upon which no reasonable trier of fact could conclude otherwise than that MDT's failure to promote him was a product of unlawful discrimination.  In suggesting that he has met this burden, Plaintiff relies on the testimony of Don Kulish that the initial interview panel

---

[12]In the reply brief in support of their summary judgment motion, Defendants suggest that the interview panel could not possibly have reached a consensus because, no matter what the other two panel members might have believed, "Robinson clearly did not agree."  (Defendants' Reply Br. at 4.)  To reach this conclusion, however, the Court would have to credit Robinson's testimony over Kulish's, given that Kulish explicitly testified that the panel ***did*** reach a consensus to recommend Plaintiff for the second available Detroit position.  Try as they might, Defendants cannot overcome this direct conflict in the evidentiary record by inviting the Court to disregard Kulish's account of the panel's activities.

reached a consensus to recommend Plaintiff for one of the available Detroit positions. (*See* Plaintiff's Motion, Br. in Support at 11-12.)[13]  It follows, in Plaintiff's view, that there was no "tie" that would warrant a second round of interviews.  Yet, just as Defendants' preferred reading of the record would require the Court to disregard Kulish's testimony, Plaintiff's reading of the record would require the Court to disregard Robinson's testimony.  If a trier of fact were to credit this latter account, then the interview panel failed to reach a consensus, and Robinson correctly advised Susan Pifer of this fact.  Although Pifer could have chosen Plaintiff over Flowers based on his slightly higher average interview score, the record surely does not compel the conclusion that her failure to do so was a product of intentional discrimination.  Rather, Pifer explained that because the panel failed to reach a consensus, either as to a recommended candidate or as to the candidates' interview scores, and because there was no material distinction between Plaintiff and Flowers as to their experience or references, she concurred in Robinson's recommendation that a second round of interviews be conducted, and secured the approval of the EEO office and human resources to proceed in this fashion.  (*See* Pifer Dep. at 25-27.)  Given Robinson's assertion that no consensus had been reached, and given that "there was a virtual tie," in her view, between two of the candidates for the remaining Detroit position, (*id.* at 51), Pifer necessarily had to choose some course of

_____

[13]Plaintiff also cites the deposition testimony of the third panel member, Scott Gibson, as purportedly supporting this proposition.  As noted earlier, however, Gibson actually testified that the panel did ***not*** reach a consensus to recommend Plaintiff for one of the Detroit positions, because Robinson did not concur in Kulish's recommendation on this point.  (*See* Gibson Dep. at 37, 51-52.)

action to break this perceived tie.  Her failure to choose the course of action favored by

Plaintiff — namely, awarding him the position — surely would not compel a trier of fact

to conclude that Pifer impermissibly acted on account of Plaintiff's race or national

origin.

Nor, contrary to Plaintiff's contention, would the record compel a reasonable trier

of fact to conclude that Robinson's refusal to concur in and forward the recommendation

of Plaintiff for one of the Detroit positions was the product of unlawful discrimination.

Notwithstanding Plaintiff's evidence that this failure to reach a consensus was "highly

unusual," (Plaintiff's Motion, Br. in Support at 13), it cannot be said that the only

plausible explanation for this unusual occurrence was that the panel chair, Robinson,

opposed his promotion on the grounds of his race or national origin.  Although Plaintiff

achieved a modestly better average score than Flowers in the first round of interviews, the

two candidates' scores were quite close, and Plaintiff has not produced evidence that

other interview panels were able to reach a consensus despite comparably close scores

and other qualifications.  Similarly, while Plaintiff points to the disparity in Robinson's

scoring of African-American candidates (O'Neal and Flowers) versus her scoring of

Plaintiff, this would merely lend support to an inference that Robinson's assessments

were affected by impermissible considerations of race or national origin, but would not

compel a trier of fact to draw this inference.  *See Sutherland v. Michigan Department of

Treasury,* 344 F.3d 603, 619 (6th Cir. 2003) ("The fact that one interviewer might have

disagreed with the evaluation of an answer accorded by another interviewer is not

16

evidence that either based his or her evaluation on anything other than his or her honest assessment of the answer . . . . [but] [r]ather . . . simply indicates that the two individuals disagree as to subjective factors, which one would expect might happen from time to time.").[14]  Accordingly, Plaintiff is not entitled to an award of summary judgment in his favor on his Title VII claims of race and national origin discrimination.

C.     **Issues of Fact Remain as to Plaintiff's Equal Protection Claim Against Defendant Robinson, But Defendant Taylor Is Entitled to Summary Judgment in His Favor on This Claim.**

Apart from his Title VII claims, Plaintiff has asserted Fourteenth Amendment equal protection claims against Defendants Robinson and Taylor, alleging that these individuals acted to deprive him of his right to be free from discrimination on account of his race and national origin.  "To succeed on a § 1983 claim of this kind, against a public employer for an equal protection violation, the plaintiff must show that the employer made an adverse employment decision with a discriminatory intent and purpose." *Sutherland,* 344 F.3d at 614 (internal quotation marks and citation omitted).  In addressing these claims, the Court "is to rely on Title VII disparate treatment cases for guidance," using the same *McDonnell Douglas* analytical framework that governs Title VII claims.  *Sutherland,* 344 F.3d at 614; *see also Weberg v. Franks,* 229 F.3d 514, 523 (6th Cir. 2000).  Moreover, because § 1983 liability is personal, Plaintiff must forge a

---

[14]Indeed, given that the other two panel members, Gibson and Kulish, were Caucasian, the same logic used by Plaintiff to question Robinson's less favorable assessment of him could seemingly be used to question Gibson's and Kulish's less favorable assessments of O'Neal and Flowers.

causal link between the actions taken by each individual Defendant, Robinson and Taylor, and a deprivation of his constitutional rights. *See Cherrington v. Skeeter,* 344 F.3d 631, 645 (6th Cir. 2003); *White ex rel. Swafford v. Gerbitz,* 892 F.2d 457, 463 (6th Cir. 1989). Finally, even if Plaintiff establishes an equal protection violation, Defendants Robinson and Taylor are entitled to qualified immunity unless their conduct "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known." *Burchett v. Kiefer,* 310 F.3d 937, 942 (6th Cir. 2002) (internal quotation marks and citation omitted).

For largely the same reasons set forth earlier as to Plaintiff's Title VII claim against MDT, the Court finds that Defendant Robinson is not entitled to summary judgment in her favor on Plaintiff's equal protection claim against her. Viewing the record in a light most favorable to Plaintiff, the three-member interview panel reached a consensus to recommend Plaintiff for promotion, and yet Robinson thwarted this consensus by reporting to the ultimate decisionmaker, Susan Pifer, that no consensus had been reached. As explained above, this view of the record, if accepted by the trier of fact, would permit the conclusion that the stated, non-discriminatory reason given by Defendants for denying Plaintiff a promotion was a pretext for unlawful discrimination. Moreover, Robinson could permissibly be viewed as playing a key role in this arguably discriminatory decisionmaking process, as there is evidence (i) that she was the person on whom Susan Pifer exclusively relied in determining that there was no consensus and that "tie-breaking" measures were warranted, and (ii) that she was the person who

18

recommended the second round of interviews that ultimately led to the selection of Flowers over Plaintiff.  Under this record, a trier of fact could reasonably conclude that Robinson acted with a discriminatory intent and purpose, and that these actions were a proximate cause of Plaintiff's failure to secure a promotion.

Nonetheless, Defendants argue that Robinson is entitled to qualified immunity because her conduct "did not violate any clearly established right."  (Defendant's Motion, Br. in Support at 16.)  In advancing this argument, however, Defendants do not raise any question or cite any authority as to whether the right allegedly violated was "clearly established."  Instead, they sweepingly deny, in the span of a single paragraph and without citation to any authority, that Robinson's conduct resulted in a constitutional deprivation of any sort, whether clearly established or otherwise.  (*See id.*)  As explained, issues of fact remain as to this threshold question.  In any event, the Court is confident that the right to be free from unlawful discrimination in public employment is clearly established.  *See, e.g., Gutzwiller v. Fenik,* 860 F.2d 1317, 1325 (6th Cir. 1988).

The Court further concludes, for reasons the same as those discussed earlier, that Plaintiff is not entitled to summary judgment in his favor on his equal protection claim against Defendant Robinson.  Viewing the record in a light most favorable to Defendants, the three members of the initial interview panel subjectively evaluated the performances of Plaintiff, O'Neal, and Flowers differently, and were unable to reach a consensus as to interview scores or recommended candidates.  Under this reading of the record, Robinson dutifully and accurately reported this lack of consensus to Susan Pifer, who ordered a

19

second round of interviews to break a perceived tie between Plaintiff and Flowers. Robinson was not a member of the second interview panel, which recommended Flowers as its consensus choice for the remaining Detroit Auditor Manager 14 position. Moreover, and as explained earlier, Robinson's mere disagreement with her fellow panelists as to the interview performances of the various candidates does not compel the conclusion that she was motivated by impermissible considerations of Plaintiff's race or national origin. Rather, a trier of fact could reasonably conclude that the differing assessments of the candidates by Robinson, Kulish, and Gibson were the product of permissible, albeit subjective, considerations having nothing to do with the race of the candidates. While a range of inferences are permissible in either Plaintiff's or Defendants' favor as to the motives of the principal actors in the decision not to promote Plaintiff, the record does not establish as a matter of law that this decision was a product of unlawful intentional discrimination.

Finally, as to Defendant Taylor, the Court finds that the evidence produced by Plaintiff is insufficient as a matter of law to permit his equal protection claim against Taylor to go forward. Because he had only recently assumed the position of administrator of MDT's Audit Division, Taylor was not involved in either the formation or the operation of the three-member panel that conducted the first series of candidate interviews. There is no evidence, then, that he had anything whatsoever to do with the process by which this panel either did or did not reach a consensus as to the candidates to recommend for promotion. In addition, the record is clear that Robinson reported to

20

Pifer, and not Taylor, as to the results of the panel's interviews and its purported failure to reach a consensus.

To be sure, Robinson brought Taylor into the loop regarding the panel's activities, showing him the letter of recommendation Don Kulish had written on Plaintiff's behalf and advising Taylor that, contrary to the letter, the panel had not reached a consensus to recommend Plaintiff for promotion.  (*See* Plaintiff's Motion, Ex. 13, Taylor Dep. at 7-8.)[15]  Taylor also attended the meeting at which Robinson told Pifer about the panel's purported failure to reach a consensus and Pifer decided to order a second round of interviews.  (*See id.* at 14-15; *see also* Pifer Dep. at 18-20.)  Yet, as non-member of interview panel, Taylor was not in a position to question Robinson's report of the panel's failure to reach a consensus, and Pifer expressly testified that she relied on the "panel chair," Robinson, to report on the panel's activities and recommend a further course of action.  (Pifer Dep. at 25-26, 44.)

Moreover, while Taylor opined at his deposition that Kulish's letter of recommendation on Plaintiff's behalf was "unacceptable" because it was not a product of panel consensus, (Taylor Dep. at 7-8), and while Pifer testified that Taylor joined in Robinson's suggestion of second round of interviews, (Pifer Dep. at 27), nothing suggests

_____

[15]Taylor further testified that he was asked by Susan Pifer to "look into" Kulish's letter, that he discussed this matter first with Kulish and then with Robinson, and that he reported his "preliminary findings" to Pifer and handed the matter over to human resources for further investigation.  (*Id.* at 9-11.)  Contrary to Plaintiff's assertion in the brief in support of his summary judgment motion, then, Taylor did not "claim[] that he knew nothing about the situation."  (Plaintiff's Motion, Br. in Support at 17.)

that these limited actions by Taylor played any role in Pifer's decision to conduct a second round of interviews to break a perceived "tie" between Plaintiff and Flowers. Rather, the testimony of the principal decisionmaker, Susan Pifer, reflects her decision to proceed in accordance with the report and recommendation of the panel chair, Robinson. *Compare Christian v. Wal-Mart Stores, Inc.,* 252 F.3d 862, 877-78 (6th Cir. 2001) (explaining that a supervisory employee's unlawful animus toward the plaintiff may be imputed to the ultimate decisionmaker where there is evidence that the latter acted as the conduit or "cat's paw" of the former's prejudice).  In any event, even if Taylor had played a greater role in this decision, there is no evidentiary basis from which to infer that he injected any race- or national origin-based animus into the process.  Finally, while Taylor was a member of the second interview panel, there is no evidentiary basis upon which to conclude that his scoring of the performances of Plaintiff and Flowers reflected anything other than his honest assessment of each candidate's responses to the panel's questions.

This record, then, utterly fails to support Plaintiff's sweeping and unfounded charge that Taylor somehow joined in some sort of "conspiracy" with Robinson to deny Plaintiff a promotion, much less to do so on the basis of Plaintiff's race or national origin. While Taylor was involved to a limited extent in the process by which Susan Pifer decided to conduct a second set of interviews, it would be a matter of sheer speculation to conclude that this limited involvement was a proximate cause of any deprivation of Plaintiff's Fourteenth Amendment right to equal protection.  Accordingly, Defendant Taylor is entitled to summary judgment in his favor on this § 1983 claim.

22

## IV.  <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' motion for summary judgment (docket #33) is GRANTED IN PART, with respect to Plaintiff's claim under 42 U.S.C. § 1983 against Defendant Tony Taylor, and is otherwise DENIED. IT IS FURTHER ORDERED that Plaintiff's motion for summary judgment (docket #34) is DENIED.


<u>s/Gerald E. Rosen</u>
Chief Judge, United States District Court

Dated:  September 10, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 10, 2009, by electronic and/or ordinary mail.

<u>s/Ruth Brissaud</u>
Case Manager